

# COURT OF APPEALS
## SECOND DISTRICT OF TEXAS
### FORT WORTH

## NO. 2-08-100-CV

LUXURY TRAVEL SOURCE D/B/A                                       APPELLANTS
LTS LUXURY TOUR SOURCE, LTD.,
MUKESH GOYAL A/K/A MUKESH
KUMAR, MAIN ST. TRAVEL CENTER
OF MONSEY, INC., AND BEN WEBER

V.

AMERICAN AIRLINES, INC.                                          APPELLEE

------------

FROM THE 67TH DISTRICT COURT OF TARRANT COUNTY

------------

## OPINION

------------

## I. Introduction

This is an appeal from the trial court's denial of appellants' special appearances in the face of allegations that they improperly bought and sold frequent flyer miles awarded by appellee to its customers. Appellants Luxury Travel Source d/b/a LTS Luxury Tour Source, Ltd. (LTS), Mukesh Goyal a/k/a

Mukesh Kumar (LTS's principal), and Main St. Travel Center of Monsey, Inc. each raise a single issue challenging the trial court's denial of their special appearances, claiming that they negated all alleged bases of personal jurisdiction. Appellant Ben Weber, Main St.'s principal, brings two issues challenging the denial of his special appearance: (1) the Texas long-arm statute does not authorize jurisdiction over him and (2) he negated all alleged grounds for personal jurisdiction. We affirm in part and reverse and render in part.

## II. Background

Appellee American Airlines, Inc., a Delaware corporation with its headquarters in Fort Worth, Texas, sued appellants (1) LTS, a British Columbia corporation with its principal place of business in Vancouver; (2) LTS's principal Goyal; (3) Main St., a New York corporation with its principal place of business in Rockland County, New York; and (4) Main St.'s principal Weber for tortious interference with contracts and business relations, fraud, misappropriation, breach of contract, and violation of the Texas trademark laws based on appellants' alleged brokering of frequent flyer miles (AAdvantage® travel rewards) issued by American as an incentive to its customers who are AAdvantage® members. All four appellants filed special appearances, which the trial court denied and from which appellants now appeal.

2

In its third amended petition, American specifically alleged the following as bases for asserting general and specific jurisdiction over appellants:

- LTS

    acknowledges that it has customers in Texas, estimating that less than ten percent of its customers are Texas residents. LTS admits it purchases AAdvantage® miles and sells AAdvantage® award tickets to its customers, including Texas residents. LTS' business requires it to reach out to American in Texas. It admittedly uses the AA.com website, whose servers are hosted in Plano. It also admittedly calls American to make AAdvantage® award ticket reservations. Many award tickets involve first class travel in Texas. Once an award ticket is issued for that reservation, LTS sells the ticket to their customers, including in Texas, who pay LTS for the ticket.

- Goyal

    admittedly has four AAdvantage® accounts in four different names, of which one was obtained through the Internet. By signing up through AA.com, he entered into two contracts with American, as to the AAdvantage® program and as to AA.com. Under the latter's forum-selection clause, Goyal agreed that any lawsuit against American related to use of the website must be brought in the courts of Tarrant County. Hundreds of thousands of miles from these accounts have been used to book award tickets for travel in Texas.

- Main St.

    admits it is bound by the terms and conditions of the Airlines Reporting Corporation Agent Reporting Agreement . . . and the American . . . Addendum to the ARC Agreement . . ., pursuant to which Main St. agreed that disputes, such as this, arising out of the Addendum are to be submitted to the courts of the State of Texas.

3

- Weber

    admits as president of Main St. he reached out to American in Texas by telephone and email to do business with it, was dealing with American on a daily basis, and the financial benefits reaped by that business would benefit him personally in the long run. However, Weber failed to disclose to American that Main St. was defrauding the AAdvantage® program."

### III.  Standard of Review

Whether a trial court has personal jurisdiction over a defendant is a question of law, which we review de novo. *Moki Mac River Expeditions v. Drugg*, 221 S.W.3d 569, 574 (Tex. 2007); *TravelJungle v. Am. Airlines, Inc*., 212 S.W.3d 841, 845 (Tex. App.—Fort Worth 2006, no pet.).  The plaintiff bears the initial burden of pleading sufficient allegations to bring a nonresident defendant within the provisions of the long-arm statute. *Moki Mac*, 221 S.W.3d at 574; *TravelJungle*, 212 S.W.3d at 845.  Once the plaintiff does so, the burden shifts to the nonresident defendant to negate all alleged jurisdictional bases. *Moki Mac*, 221 S.W.3d at 574; *TravelJungle*, 212 S.W.3d at 845.  We review all of the evidence in making this determination. *TravelJungle*, 212 S.W.3d at 845.

When, as here, a trial court does not issue findings of fact and conclusions of law with its special appearance ruling, we infer all implied facts necessary to support the judgment and supported by the evidence. *Moki Mac*,

4

221 S.W.3d at 574; *TravelJungle*, 212 S.W.3d at 845. Because here the appellate record includes both the reporter's and clerk's records, however, these implied findings are not conclusive. *BMC Software Belg., N.V. v. Marchand*, 83 S.W.3d 789, 795 (Tex. 2002); *TravelJungle*, 212 S.W.3d at 845. We may review the trial court's resolution of disputed fact issues for legal and factual sufficiency under the same standards of review that we apply in reviewing a jury's or trial court's findings of fact at trial. *TravelJungle*, 212 S.W.3d at 845.

### IV. Personal Jurisdiction

A Texas court may assert personal jurisdiction over a nonresident defendant only if the requirements of due process under the Fourteenth Amendment and the Texas long-arm statute are satisfied. U.S. Const. amend. XIV, § 1; Tex. Civ. Prac. & Rem. Code Ann. §§ 17.041–.045 (Vernon 2008); *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 413–14, 104 S. Ct. 1868, 1871–72 (1984); *Moki Mac*, 221 S.W.3d at 574.

### A. Long-arm Statute

The Texas long-arm statute governs Texas courts' exercise of jurisdiction over nonresident defendants. Tex. Civ. Prac. & Rem. Code Ann. §§ 17.041–.045; *BMC Software*, 83 S.W.3d at 795; *TravelJungle*, 212 S.W.3d at 845. That statute permits Texas courts to exercise jurisdiction over a

5

nonresident defendant who "does business" in Texas. Tex. Civ. Prac. & Rem. Code Ann. § 17.042; *BMC Software*, 83 S.W.3d at 795; *TravelJungle*, 212 S.W.3d at 845. The statute lists some activities that constitute "doing business" in Texas, including (1) contracting with a Texas resident by mail or otherwise when either party is to perform the contract in whole or in part in Texas, and (2) committing a tort, in whole or in part, in Texas. Tex. Civ. Prac. & Rem. Code Ann. § 17.042; *Moki Mac*, 221 S.W.3d at 574; *TravelJungle*, 212 S.W.3d at 845. The list of activities set forth in section 17.042 is not exclusive, however. *BMC Software*, 83 S.W.3d at 795; *TravelJungle*, 212 S.W.3d at 845.

Even if a nonresident's activities constitute "doing business" under section 17.042's broad language, Texas courts may exercise personal jurisdiction over a nonresident defendant only "as far as the federal constitutional requirements of due process will allow." *Moki Mac*, 221 S.W.3d at 575 (quoting *Guardian Royal Exch. Assurance, Ltd. v. English China Clays, P.L.C.*, 815 S.W.2d 223, 226 (Tex. 1991)); *TravelJungle*, 212 S.W.3d at 845. Therefore, in determining whether a nonresident defendant has met its burden to negate all bases of jurisdiction, we rely on precedent from the United States Supreme Court and other federal courts, as well as our own state's decisions. *BMC Software*, 83 S.W.3d at 795; *TravelJungle*, 212 S.W.3d at 845–46.

6

**B.    Due Process**

Due process is satisfied when (1) the defendant has established minimum contacts with the forum state and (2) the exercise of jurisdiction comports with traditional notions of fair play and substantial justice. *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316, 66 S. Ct. 154, 158 (1945); *Moki Mac*, 221 S.W.3d at 575; *TravelJungle*, 212 S.W.3d at 846. A nonresident defendant who has "purposefully availed" itself of the privileges of conducting business in a foreign jurisdiction, invoking the benefits and protections of its laws, has sufficient minimum contacts with the forum to confer personal jurisdiction on a court in that forum. *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 474–76, 105 S. Ct. 2174, 2183–84 (1985); *Moki Mac*, 221 S.W.3d at 575. Three factors important in determining whether a defendant has purposefully availed itself of the forum are (1) only the defendant's contacts with the forum count; (2) the acts relied on must be purposeful rather than merely fortuitous; and (3) the defendant must seek some benefit, advantage, or profit by availing itself of the forum. *Michiana Easy Livin' Country, Inc. v. Holten*, 168 S.W.3d 777, 785 (Tex. 2005); *TravelJungle*, 212 S.W.3d at 846; *Karstetter v. Voss*, 184 S.W.3d 396, 403 (Tex. App.—Dallas 2006, no pet.).

Because of the unique and onerous burden placed on a party called upon to defend a suit in a foreign legal system, the minimum contacts analysis is

particularly important when the defendant is from a different country. *Asahi Metal Indus. Co. v. Super. Ct. of Cal.*, 480 U.S. 102, 114, 107 S. Ct. 1026, 1033 (1987); *BMC Software*, 83 S.W.3d at 795. A defendant should not be subject to a foreign court's jurisdiction based on random, fortuitous, or attenuated contacts. *Burger King*, 471 U.S. at 475, 105 S. Ct. at 2183; *BMC Software*, 83 S.W.3d at 795. Rather, individuals must have fair warning that a particular activity may subject them to the jurisdiction of a foreign sovereign. *Burger King*, 471 U.S. at 472, 105 S. Ct. at 2182; *Guardian Royal*, 815 S.W.2d at 226; *TravelJungle*, 212 S.W.3d at 846.

**C.** **General v. Specific Jurisdiction**

Personal jurisdiction exists if the nonresident defendant's minimum contacts give rise to either specific jurisdiction or general jurisdiction. *Helicopteros Nacionales de Colombia*, 466 U.S. at 413–14, 104 S. Ct. at 1872; *BMC Software*, 83 S.W.3d at 795; *TravelJungle*, 212 S.W.3d at 846. A trial court has general jurisdiction over a nonresident defendant when that defendant's contacts in a forum are continuous and systematic so that the forum may exercise personal jurisdiction over the defendant even if the cause of action did not arise from or relate to activities conducted within the forum state. *Moki Mac*, 221 S.W.3d at 575; *TravelJungle*, 212 S.W.3d at 846. In contrast, specific jurisdiction is present if the nonresident defendant's alleged

8

liability arises from or is related to an activity conducted within the forum. *Moki Mac*, 221 S.W.3d at 575; *TravelJungle*, 212 S.W.3d at 846–47. In other words, "there must be a substantial connection between those contacts and the operative facts of the litigation." *Moki Mac*, 221 S.W.3d at 585. When a plaintiff asserts that a trial court has specific jurisdiction over a nonresident defendant, the minimum contacts analysis focuses on the relationship among the defendant, the forum, and the litigation. *Moki Mac*, 221 S.W.3d at 575–76; *Guardian Royal*, 815 S.W.2d at 227–28; *TravelJungle*, 212 S.W.3d at 846–47.

For a Texas trial court to have specific jurisdiction over a nonresident defendant, it is not necessary that the nonresident defendant's conduct actually occur in Texas, as long as the defendant's acts were purposefully directed towards Texas. *Calder v. Jones*, 465 U.S. 783, 789–90, 104 S. Ct. 1482, 1487 (1984); *CSR Ltd. v. Link*, 925 S.W.2d 591, 595 (Tex. 1996); *TravelJungle*, 212 S.W.3d at 847. "[A] defendant should reasonably anticipate being haled into court where the effects of its conduct have been intentionally caused through the purposeful direction of activity toward the forum state, even if the defendant never physically enters the state." *SITQ, E.U., Inc. v. Reata Rests., Inc.*, 111 S.W.3d 638, 646 (Tex. App.—Fort Worth 2003, pet.

denied) (quoting *Cole v. The Tobacco Inst.*, 47 F. Supp. 2d 812, 815 (E.D. Tex. 1999)).

## V. LTS

LTS admits that it "purchases and barters" AAdvantage® reward points. It obtains customers via several of its websites that offer to purchase AAdvantage® reward points or to sell travel on American. These websites function as LTS's sole means of advertising in Texas;[1] it does not purchase print advertising, phone lists, or mailing lists.[2]

LTS obtains customers by allowing prospective customers to submit information to LTS via a "Contact Us" link on one of the websites. No other form of communication occurs via the websites.[3] Once a potential LTS customer sends its written contact information via the "Contact Us" link on a website, a company representative contacts the potential customer at his or her request by telephone or overnight courier. LTS estimates that approximately less than ten percent of its worldwide customers are Texas residents. It admits

---

[1] These websites are accessible by internet users worldwide.

[2] LTS conducts all of its operations in British Columbia. It does not have and has never had any physical presence in Texas. It does not maintain an office, address, phone listing, or registered agent in Texas. It does not have any agents, affiliated companies, bank accounts, or property in Texas.

[3] In the past, the websites displayed American's business logo, as well as other airlines' logos.

10

that some of its customers may have flown through DFW airport on tickets booked as a result of its activities.

American presented evidence that LTS buys AAdvantage® rewards points from customers, some of whom live in Texas, and pays them by sending checks; some of those checks are mailed to customers in Texas. LTS also obtains AAdvantage® rewards points from accounts opened up and maintained by its employees, including Goyal; it then sells those points to third parties. Goyal admitted that in conducting its business, LTS sometimes accesses the AAdvantage® rewards chart, and possibly American's flight schedules, on American's website, AA.com; American presented evidence that the servers that power AA.com are located in Plano, Texas. LTS then calls American reservations centers, one-third of which are in Texas, to make reservations for a different customer using the AAdvantage® rewards points procured.[4] After it makes a reservation, LTS provides the reservation number to the customer from whom it purchased the AAdvantage® rewards points and instructs that customer to contact American to issue the ticket. American thus issues the ticket in the name of the customer who is not an AAdvantage® member and

---

[4] All AAdvantage® rewards are processed in Texas by American.

that customer pays LTS for the ticket.[5]  Some of the customers who purchase tickets from LTS are Texas residents.

American presented evidence that LTS directly contacted at least two Texas residents by email[6] and, for the purposes of obtaining the benefit of those customers' AAdvantage® rewards points, induced them to contact American to issue tickets with those rewards points for existing reservations that LTS had already made for the benefit of other customers.  LTS then sent checks to at least one of those customers in Texas.

Thus, there is some evidence that LTS used its contacts with Texas residents to deliberately induce activity in Texas by American, and LTS's customers, to LTS's benefit.  *See SITQ*, 111 S.W.3d at 653.  Additionally, part of LTS's agreements with its Texas customers, at least as to sales of reward points, were performable in Texas.  *See Gutierrez v. Cayman Islands Firm of Deloitte & Touche*, 100 S.W.3d 261, 271 (Tex. App.—San Antonio 2002, pet.

---

[5] When LTS obtains points from its employees' accounts, an LTS representative books the tickets for the third party customers.

[6] American also presented evidence that when a customer submits information on LTS's websites, he or she is asked to provide LTS with his or her city, state, zip code, home phone number, and cell phone number.  One of the customers averred that she found out about LTS through one of its websites, but another customer averred that he did not know how LTS got his contact information.

12

dism'd). These contacts between LTS and Texas are substantially connected to the operative facts underlying the causes of action alleged by American: its means of contacting Texas residents and the activities that it induced in Texas are the crux of American's complaint. *Cf*. *Moki Mac*, 221 S.W.3d at 584–85. Accordingly, we conclude and hold that American showed sufficient minimum contacts between LTS and Texas to satisfy the requirements of due process.

LTS contends that this case is more akin to *Michiana*, in which a Texas resident, unsolicited, contacted an Indiana company, which sold that resident an RV that it manufactured in Indiana and then delivered to Texas. *Michiana*, 168 S.W.3d at 781, 784. The supreme court determined that Michiana's contacts with Texas were too attenuated to support personal jurisdiction; it had no contacts with Texas other than the fact that one customer happened to place an order from here. *Id*. at 794.

But LTS's contacts here are not so attenuated that it could not have foreseen suit in Texas. Although at least two Texas customers initiated contact through an LTS website,[7] LTS's contacts went further than merely taking an

---

[7] Relying on Texas cases involving internet communications, LTS also contends that it operated only a passive website and did not actively solicit customers in Texas. *See, e.g., Reiff v. Roy*, 115 S.W.3d 700, 705–06 (Tex. App.—Dallas 2003, pet. denied) (determining that company's interactive website did not constitute continuous and systematic contacts sufficient to support general jurisdiction); *Michel v. Rocket Eng'g Corp.*, 45 S.W.3d 658,

13

order from a customer.  LTS deliberately induced its Texas customers to undertake further activity in Texas, directed at a Texas business, in direct contravention of an agreement between those residents and the Texas business. *See Burger King*, 471 U.S. at 472–73, 105 S. Ct. 2182–83 (holding that "fair warning" requirement of due process is satisfied when nonresident defendant has purposefully directed activities at forum residents).  Although Goyal estimated that AAdvantage® rewards points were LTS's fourth most popular product, American presented evidence that LTS used millions of points from Goyal's accounts alone.  And it is not difficult to foresee that a large number of AAdvantage® members would be located in Texas, where American is headquartered.  American has also sued, in this same action, Texas corporations that it alleges are engaged in the same activity for profit.  For these reasons, we also conclude and hold that subjecting LTS to personal jurisdiction comports with traditional notions of fair play and substantial justice.

---

677–78 (Tex. App. Fort Worth 2001, no pet.) (determining that company's passive website was not a "purposeful activity directed toward residents of [Texas] to be considered in determining whether general jurisdiction exists"). However, our analysis does not turn on any allegation that LTS actively solicited customers in Texas or any allegation that its website was so interactive that it might have established the requisite contacts.  Accordingly, we do not find these cases dispositive.

*See Jones v. Beech Aircraft Corp.*, 995 S.W.2d 767, 774 (Tex. App.—San Antonio 1999, pet. dism'd w.o.j.).

Accordingly, we conclude and hold that the trial court did not err by determining that LTS failed to negate all bases of personal jurisdiction, particularly, specific jurisdiction; thus, the trial court did not err by denying LTS's special appearance. We overrule LTS's sole issue on appeal.

## VI. Goyal

Goyal is a Canadian citizen and the sole officer and principal of LTS. He has four AAdvantage® accounts in his own name, one of which American alleges was established for him over the Internet.[8] Goyal testified by deposition that these accounts are his personal accounts but they are used for LTS's benefit. According to Goyal, he obtained the AAdvantage® rewards points in his account from purchasing Starwood[9] credit card points, which were converted into AAdvantage® rewards points. He authorized LTS to book tickets on American in LTS's customers' names using rewards points from his

---

[8] Although Goyal swore in his special appearance that he became a member by signing up on the internet, he later testified in his deposition that he "likely" signed up over the internet and that a person he could not remember "probably" registered this account for him via the internet.

[9] Starwood is a third party program that offers rewards points to its participants.

15

accounts. Goyal contends that he did not personally purchase or sell AAdvantage® rewards and that he does not have any customers; only LTS has customers. But American presented evidence that LTS redeemed AAdvantage® rewards points through Goyal's personal AAdvantage® accounts. It also presented evidence that at least two of LTS's Texas customers bought some of the tickets issued with AAdvantage® rewards points from Goyal's accounts and that Goyal himself booked at least one ticket.

American also presented evidence that to use the AAdvantage® rewards, members must abide by the terms and conditions governing the AAdvantage® rewards program, which bars members from purchasing, selling, or bartering the rewards and award tickets. Any customer enrolling in the AAdvantage® program online must abide by the terms of the American Use Agreement, which states that it is made and entered into in Tarrant County, Texas and governed by Texas law. It also states, "Any lawsuit brought by you related to your access to, dealings with, or use of the Site must be brought in the state or federal courts of Tarrant County, Texas."

American contends that Goyal is subject to personal jurisdiction in Texas by virtue of both his individual contacts with Texas and his acceptance of the Use Agreement upon signing up to be an AAdvantage® member. But the Use

16

Agreement, even if admissible and binding upon Goyal,[10] does not show that Goyal agreed to subject himself to the jurisdiction of the Texas courts. It clearly states that any suit brought by Goyal against American must be brought in the courts of Tarrant County, Texas. But it does not conversely say that Goyal agrees to subject himself to the jurisdiction of the Texas courts for purposes of a suit against him arising out of his AAdvantage® membership. Accordingly, we conclude and hold that the Use Agreement does not establish personal jurisdiction over Goyal. *See Ramsay v. Tex. Trading Co*., 254 S.W.3d 620, 626 (Tex. App.—Texarkana 2008, pet. denied) (noting that courts construe forum selection clause in same way as any other contract); *Alenia Spazio S.p.A. v. Reid*, 130 S.W.3d 201, 219 (Tex. App.—Houston [14th Dist.] 2003, pet. denied) ("By agreeing to a Texas choice-of-law provision, a party does not avail itself of any protection from Texas courts or voluntarily submit to personal jurisdiction in Texas courts, absent an express understanding to that effect.").

---

[10] LTS and Goyal both objected to the admissibility of the Use Agreement and both contend that it is not binding upon them. However, we need not address these arguments because we determine that the Use Agreement does not establish jurisdiction in this case. *See* Tex. R. App. P. 47.1; *In re Roxsane R*., 249 S.W.3d 764, 772 (Tex. App.—Fort Worth 2008, orig. proceeding).

17

Even if a nonresident corporate officer's acts were undertaken in a corporate capacity, that officer may still be subject to personal jurisdiction in a forum if those actions were tortious or fraudulent and if the tortious or fraudulent actions satisfy the three *Michiana* minimum contacts factors: (1) only the defendant's contacts with the forum count; (2) the acts relied on must be purposeful rather than merely fortuitous; and (3) the defendant must seek some benefit, advantage, or profit by availing itself of the forum.[11] *Michiana*, 168 S.W.3d at 785, 788–89; *Niehaus v. Cedar Bridge, Inc.*, 208 S.W.3d 575, 581 (Tex. App.—Austin 2006, no pet.); *SITQ*, 111 S.W.3d at 651. But the mere fact that a nonresident defendant could foresee that his out-of-state actions would cause injury in Texas is not sufficient to hale the nonresident into Texas to litigate that injury. *Niehaus*, 208 S.W.3d at 582; *see Michiana*, 168 S.W.3d at 789–90.

Although Goyal participated personally in LTS's actions towards Texas—by allowing LTS to use rewards points from his personal AAdvantage® accounts and by personally booking travel for at least one LTS customer using

---

[11] American did not urge any other theory upon which to base Texas's jurisdiction over Goyal in his individual capacity, such as piercing the corporate veil. *See Niehaus v. Cedar Bridge, Inc.*, 208 S.W.3d 575, 581 (Tex. App.—Austin 2006, no pet.); *Tri-State Building Specialties, Inc. v. NCI Building Sys.*, 184 S.W.3d 242, 250 (Tex. App.—Houston [1st Dist.] 2005, no pet.).

18

AAdvantage® rewards points—all of Goyal's activity for which American adduced evidence occurred in Vancouver. There was no evidence that he himself personally induced Texas residents to engage in activities in Texas, nor that he was aware of LTS's employees' directions to Texas residents to make misrepresentations to American regarding the use of the customers' AAdvantage® rewards points. *Cf. SITQ*, 111 S.W.3d at 650 (holding that evidence showing corporate officers' individual participation in decision to terminate tenant's leases in Fort Worth building while directing others to assure tenants that leases would not be terminated and that building would be rebuilt was sufficient to establish minimum contacts as to officers individually). Although there is evidence that Goyal accumulated a significant amount of rewards points from Starwood, which he deliberately converted to AAdvantage® rewards points that he allowed LTS to use, the evidence of his individual activity in connection with LTS's business does not rise to the level of LTS's purposeful availment of Texas's jurisdiction. *See Niehaus*, 208 S.W.3d at 582–83 (holding that officers of California corporation who gave themselves bonuses in same year corporation failed to pay lease in Texas did not purposefully avail themselves of Texas's jurisdiction when all of their activities occurred in California and only injury was felt in Texas). Accordingly, we conclude and hold that Goyal negated all bases of personal jurisdiction

19

asserted by American as to its claims against him in his individual capacity and that the trial court thus erred by denying his special appearance. We sustain his sole issue on appeal.

## VII. Main St.

Main St. is a New York travel agency with its only place of business in Rockland County, New York. It does not advertise or market its services outside of New York, and it does not maintain a website or engage in online solicitations. Main St. obtains customers by word of mouth and by advertising locally in New York. It does not have an office, bank account, or any other property in Texas, nor does it have any employees or a registered agent in Texas.

When Main St. gets a call from a potential customer, it searches a Global Distribution System (GDS) for airfare, hotels, or both. It contracts with a third-party GDS provider, Sabre, to obtain flight information via the GDS.

Main St. is authorized to sell and issue tickets on American and other airlines as a party to an Airlines Reporting Agreement among Main St., the Airlines Reporting Commission — a corporation owned by several airlines[12] — and

---

[12] "ARC is a corporation whose stockholders are the principal scheduled airlines of the United States. ARC serves as the national clearinghouse for issuing blank ticket stock and other forms of traffic documents to travel agents to be issued as air passenger tickets by travel agents to their customers." *In*

"each carrier which is or may become a party to ARC's carrier service agreement and [which] has appointed [Main St.] as its agent for the issuance of ARC traffic documents in connection with sales of air transportation and/or ancillary services."  A provision of the ARC Agreement requires travel agents to "comply with all instructions of the carrier" in issuing tickets.

American issued an addendum to the ARC Agreement on April 1, 2005, which it amended on December 19, 2006.[13]  The 2005 and amended 2006 addenda each state that selling tickets on American after the effective date constitutes an agreement by the agent to the terms of the addendum.  Both addenda contain the following forum selection clause:

> THE LAWS OF THE STATE OF TEXAS AND THE UNITED STATES OF AMERICA SHALL GOVERN ANY DISPUTES BETWEEN AMERICAN AND AGENT ARISING OUT OF THE ARC AGREEMENT OR THIS ADDENDUM.  AGENT HEREBY SUBMITS AND CONSENTS TO THE NON-EXCLUSIVE JURISDICTION OF THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT

---

*re Vinogradova*, 270 B.R. 159, 163 (Bkrtcy. S.D.N.Y. 2001).

[13] An earlier version of the addendum effective in September 1993 contained the following forum selection clause:

> AGENT HEREBY SUBMITS AND CONSENTS TO THE NON-EXCLUSIVE JURISDICTION OF THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF TEXAS AND THE COURTS OF THE STATE OF TEXAS IN ANY DISPUTES BETWEEN AMERICAN AND AGENT ARISING OUT OF THE ARC REPORTING AGREEMENT OR THIS ADDENDUM.

21

OF TEXAS AND THE COURTS OF THE STATE OF TEXAS FOR ALL THESE DISPUTES.

American contends that this addendum contains its carrier-specific "instructions" that Main St. agreed to abide by in the ARC Agreement and that by continuing to sell tickets on American, Main St. agreed to be bound by the forum selection clause. Main St. contends that the forum selection clause should not be enforced against it because it was not signed by either party, Main St. was not aware of the clause, and it is a contract of adhesion.[14]

A court must presume that a forum selection clause is valid and enforceable and must enforce the clause unless the opposing party meets a "heavy burden of proof" to show that (1) the clause was procured by fraud, undue influence, or overreaching or (2) enforcement would be unreasonable and unjust. *M/S Bremen v. Zapata Off-Shore Co*., 407 U.S. 1, 17, 92 S. Ct. 1907, 1917 (1972); *Michiana*, 168 S.W.3d at 793; *In re Boehme*, 256 S.W.3d 878, 881 (Tex. App.—Houston [14th Dist.] 2008, orig. proceeding). This is

---

[14] Main St. also contends that the dispute does not come within the scope of the forum selection clause; however, American alleges that Main St. sold tickets in violation of the terms of the addendum and the ARC agreement, which obligates agencies to do business with the carriers in good faith. Thus, if the forum selection clause is applicable to Main St., American's claims fall squarely within its scope. *See Deep Water Slender Wells, Ltd. v. Shell Int'l Exploration & Prod., Inc.*, 234 S.W.3d 679, 687–89 (Tex. App.—Houston [14th Dist.] 2007, pet. denied).

22

essentially a fundamental fairness inquiry; in determining the fairness of such a clause, courts should consider (1) whether there is an indication that the forum was selected to discourage legitimate claims, (2) whether the opposing party was given adequate notice of the forum selection clause, and (3) whether the opposing party retained the option of rejecting the contract with impunity following notice of the forum selection clause. *Stobaugh v. Norwegian Cruise Line Ltd.*, 5 S.W.3d 232, 235 (Tex. App.—Houston [14th Dist.] 1999, pet. denied), (citing *Carnival Cruise Lines, Inc. v. Shute*, 499 U.S. 585, 595, 111 S. Ct. 1522, 1528 (1991), *cert. denied*, 531 U.S. 820 (2000)).

American presented evidence through questioning Weber in his deposition of a letter dated December 20, 2006 from its senior vice president of global sales that notified agents that "[t]his week American Airlines released an important update to its addendum to the ARC Agent Reporting Agreement, ARC addendum." It also presented evidence that it kept a list of the email addresses to which the letter was sent, including Main St.'s. Further, American presented evidence that the addendum was posted on AA.com in December 2006 as a news item. When asked whether he accessed AA.com to review the update, Weber answered, "Probably not."

Weber testified that he was not aware that the addendum was available on AA.com and that he did not recall receiving a December 20, 2006 email

23

with the letter regarding the update. Weber signed the ARC Agreement in New York, but he did not sign any of the addenda. He testified that he was not allowed to negotiate the terms of any of the agreements; he "just had to take them as is." However, when asked whether American represented to him that there would be no negotiation of the terms, Weber answered, "they just send [sic] me to sign." Weber admitted that he contacted American almost daily in carrying out his business.

Contrary to Main St.'s contention, American introduced at least some evidence that it notified Main St. of the amended addendum, which did not substantively change the forum selection clause that had been a part of the addendum since 1993. Additionally, a party who signs an agreement is presumed to know its contents, even those parts that incorporate other documents by reference. *In re Lyon Fin. Servs.*, 257 S.W.3d 228, 232 (Tex. 2008) (orig. proceeding); *Mikey's Houses, LLC v. Bank of Am., N.A.*, 232 S.W.3d 145, 167 (Tex. App.—Fort Worth 2007, no pet. [mand. pending]) (Livingston, J., dissenting). Although Weber testified that he had to take the ARC Agreement and addenda as they were presented to Main St., there is no evidence that Main St. was obligated to sell tickets on American under the ARC Agreement or that it was prohibited under the ARC Agreement from ceasing to sell tickets on American at any time it wished. A bargain is not negated simply

24

because one party may have been in a more advantageous bargaining position; only if there is evidence of fraud, unfair surprise, or oppression will a court refuse to enforce a forum selection clause. *Lyon Fin. Servs.*, 257 S.W.3d at 233; *see In re Vinogradova*, 270 B.R. 159, 172 (Bkrtcy. S.D.N.Y. 2001) (noting that relationship between travel agent and ARC in that case was "arm's length, commercial and contractual in nature"); *cf*. *In re Halliburton Co*., 80 S.W.3d 566, 572 (Tex. 2002) (holding arbitration provision not unconscionable even though employer made take-it-or-leave-it offer to at-will employees), *cert. denied*, 537 U.S. 1112 (2003). Moreover, a contract of adhesion is not per se unconscionable or void. *Lyon Fin. Servs*., 257 S.W.3d at 233.

Main St. has been in the travel business since April 1984. It sells tickets not only to individual customers, but it is also a wholesaler of tickets to about twenty other travel agents. In one of the emails he sent to American in 2004, Weber represented that "[t]his past year I had over 10 million dollars in sales."

Based on the foregoing, we conclude and hold that the forum selection clause in American's addendum to the ARC Agreement does not fail for lack of fundamental fairness; Main St. has not met its "heavy burden" to prove fraud, overreaching, or such a one-sidedness to the transaction that the provision is unconscionable. As such, the trial court was obligated to enforce the provision. *See Michiana*, 168 S.W.3d at 793. We conclude and hold that the trial court

25

did not err by denying Main St.'s special appearance, and we overrule Main St.'s sole issue on appeal.

## VIII. Weber

Weber is a New York resident and the president of Main St. He does not maintain a place of business or residence in Texas. According to American, Weber does business in Texas through continuous contacts with American, including emails, phone calls, letters, and various other matters such as generating business and contract negotiations.[15] To benefit Main St. by selling more tickets on American, Weber, as president of Main St., dealt with American on a daily basis. Weber admitted that Main St.'s doing more business with American benefitted him personally because it translated into more profit for Main St. According to American, Weber's contacts with American are substantially connected to its claims against him because during those contacts, he failed to disclose that Main St. was defrauding the AAdvantage® program. *See Moki Mac*, 221 S.W.3d at 585.

American did not present any evidence that Weber's contacts with it were undertaken in any capacity other than as president of Main St., nor did it present any evidence of alter ego or piercing the corporate veil. Thus, the

---

[15] American concedes in its surreply brief that its jurisdictional allegations against Weber relate only to specific jurisdiction.

analysis applicable to Goyal, above, applies, and we must determine whether any alleged fraudulent or tortious action by Weber satisfies the three *Michiana* factors. *See Michiana*, 168 S.W.3d at 785, 788–89; *Niehaus*, 208 S.W.3d at 581; *SITQ*, 111 S.W.3d at 651.

Although American presented some evidence that a travel agent named Israel Odze booked tickets using AAdvantage® rewards points for third party customers using Main St.'s GDS code, and that Weber admitted in a telephone conversation with an American representative that Odze was an agent of Main St.'s, it did not present evidence that Weber had any personal knowledge of Odze's activities. American seeks to show Weber's knowledge by evidence that as president of Main St., he was responsible for "running the place." But Weber testified that he thought Odze was located in Israel and that Main St. sometimes allowed independent agents to use its GDS codes to book the wholesale tickets it sold to those agents. There is no evidence that Odze operated out of Main St.'s offices in a way that Weber would have necessarily had knowledge of Odze's activities; Main St. had several employees, including an employee responsible for accounting. Although American rightly points out that the trial court was free to disbelieve Weber's testimony that he did not direct Odze to engage in any tortious conduct, it nevertheless failed to present any evidence linking Weber directly to Odze's actions such that he could be

27

charged with knowledge and approval of those actions. *Cf. SITQ*, 111 S.W.3d at 650. Thus, we conclude and hold that Weber negated American's alleged bases of personal jurisdiction and that, therefore, the trial court erred by denying Weber's special appearance. We sustain Weber's second issue.[16]

## IX.  Conclusion

Having determined that the trial court did not err by denying LTS's and Main St.'s special appearances, we affirm the trial court's orders denying their special appearances. However, having determined that the trial court erred by denying Goyal's and Weber's special appearances, we reverse the trial court's orders denying their special appearances and render judgment dismissing American's claims against each of them for want of personal jurisdiction. *See BMC Software*, 83 S.W.3d at 801.

TERRIE LIVINGSTON
JUSTICE

PANEL:  LIVINGSTON, DAUPHINOT, and MCCOY, JJ.

DELIVERED:  December 31, 2008

---

[16] Having determined that Weber is entitled to relief on his second issue, we need not address his first. *See* Tex. R. App. P. 47.1.