**Reverse and Render; Opinion Filed July 31, 2017.**



In The

# Court of Appeals
# Fifth District of Texas at Dallas

## No. 05-16-01132-CV

**FRIED, FRANK, HARRIS, SHRIVER & JACOBSON LLP AND RICHARD A. WOLFE, Appellants**

**V.**

**MILLENNIUM CHEMICALS INC., MILLENNIUM AMERICA HOLDINGS, LLC AND MILLENNIUM HOLDINGS, LLC, Appellees**

On Appeal from the 116th Judicial District Court
Dallas County, Texas
Trial Court Cause No. DC-12-13422

## MEMORANDUM OPINION
Before Justices Lang, Myers, and Stoddart
Opinion by Justice Lang

In this interlocutory appeal, the law firm of Fried, Frank, Harris, Shriver & Jacobson LLP ("Fried Frank") and attorney Richard A. Wolfe (collectively, "appellants" or "defendants") challenge the trial court's order denying their special appearance. In twelve issues on appeal, appellants contend this Court should reverse the trial court's order and render judgment dismissing this case because the trial court lacked specific jurisdiction over them and, alternatively, they "are immune from suit and personal jurisdiction under the longstanding doctrine of attorney immunity."[1]

---

[1] Specifically, appellants' twelve issues are as follows:

This Court should reverse and render judgment dismissing the case:

We decide in favor of appellants on their first and twelfth issues. We need not reach appellants' remaining issues. We reverse the trial court's order denying appellants' special appearance and render judgment dismissing the claims of appellees Millennium Chemicals Inc.; Millennium America Holdings, LLC; and Millennium Holdings, LLC (collectively, "Millennium" or "plaintiffs") against appellants for lack of personal jurisdiction.

## I. FACTUAL AND PROCEDURAL CONTEXT

Millennium filed this lawsuit against appellants and Millennium's former corporate parent, Hanson,[2] in November 2012. In its live petition at the time of the order complained of, Millennium stated in part that Wolfe is a tax partner at Fried Frank and the principal business offices of both appellants are located in New York. According to Millennium's petition, prior to 1996, Hanson and Millennium were "part of the same corporate family," for which Wolfe and others at Fried Frank performed legal services. In approximately September 1996, Hanson completed a "demerger transaction" (the "Demerger") in which it "divided itself into four parts

1. Because the trial court should have granted the special appearance.
2. Because denying the special appearance violated this Court's controlling precedent for personal jurisdiction over nonresident attorneys, including *Ahrens*, *Mitchell*, *Bergenholtz*, *Daniels*, and *Hotel Partners*.
3. Because failure to apply this Court's controlling precedent for personal jurisdiction over nonresident attorneys, set forth and enforced recently in *Mitchell*, violates the settled reasonable expectations of nonresident attorneys, thus violating due process.
4. Because representing a client who fortuitously moves to Texas years into the representation does not constitute purposeful availment of the benefits of Texas laws.
5. Because the nonresident attorneys did not solicit business in Texas; their relationship with their multinational client existed for years before some client personnel fortuitously moved to Texas even while other client personnel involved in the matter remained outside Texas.
6. Because a single, isolated trip to Texas solely to represent a client in a meeting with the IRS does not establish personal jurisdiction over a nonresident attorney under *Hotel Partners*, a case in which nine trips did not establish jurisdiction, because representing a client in a forum is the client's contact, not the attorney's.
7. Because Defendants are immune from suit and personal jurisdiction under the longstanding doctrine of attorney immunity, since Plaintiffs' complaints all are about Defendant-attorneys' representation of their client.
8. Because Plaintiffs' "virtual presence" theory is just the invalid "direct-a-tort" theory repudiated by *Searcy*, relabeled as "direct-a-client."
9. Because Plaintiffs' theory improperly reverses the roles of principal and agent and would transform New York attorneys into the principal and their Texas client into the agent, which is contrary to Texas law and the pleaded facts.
10. Because Plaintiffs may not entrap Defendants or manufacture jurisdiction by instigating communications through a third-party's counsel from Texas in anticipation of litigation, and then register to do business in Texas on the day Plaintiffs filed suit.
11. Because it was error for the trial court to overrule evidentiary objections to Plaintiffs' 1,756-page, unauthenticated, unnumbered, and largely uncited appendix that was never admitted into evidence.
12. Because Plaintiffs failed to meet their evidentiary burden, and there is no legally or factually sufficient evidence to support jurisdiction.

[2] Following arbitration between plaintiffs and Hanson, plaintiffs' claims against Hanson were dismissed with prejudice in approximately late 2014. Hanson is not a party to this appeal.

by business line" and "spun off each line into a separate company." Millennium, which was based in New Jersey at that time, was one of those separate companies. As part of the Demerger, Wolfe drafted a "tax sharing agreement" (the "Agreement"), which was executed in September 1996 and "allocated tax responsibilities between the companies for pre-and post-Demerger years." According to the petition, (1) "[o]ver the next decade, Wolfe served as Millennium's principal outside tax advisor and provided advice concerning Millennium's rights under the [Agreement]" and (2) "Millennium never terminated its relationship with Fried Frank and Wolfe."

During 2002, the IRS audited Millennium's pre-Demerger tax returns, disallowed use of $65 million in tax deductions relating to certain environmental expenses incurred by Millennium prior to the Demerger, and determined that those deductions could be claimed by Hanson in later years as related insurance proceeds were received. Consequently, pursuant to the Agreement, Hanson was obligated to pay Millennium for the tax benefit obtained from Hanson's post-Demerger use of the $65-million tax deduction. Millennium stated that "following Wolfe's advice," the head of Millennium's tax department, Corey Siegel, "demanded payment from Hanson," but "Hanson, after *also* consulting with Wolfe . . . , refused and provided disingenuous reasons for not paying." (emphasis original). According to Millennium, (1) Hanson "instead promised that it would make payment in the future" if Millennium entered into a "clarifying" amendment to the Agreement respecting tax benefits (the "TBA"); (2) again relying on Wolfe's advice, "Siegel was duped into signing the TBA," which was drafted by Wolfe; and (3) although Wolfe had advised Millennium that "the TBA would create 'certainty' that Hanson would make the tax benefit payment," Hanson and Wolfe "used the agreement to avoid paying Millennium for over a decade."

–3–

In 2004, Millennium was acquired by a Houston-based company and Millennium's ongoing business activities were "transitioned" to Houston, where they currently remain. Also, according to Millennium, "Hanson's headquarters moved from New Jersey to Dallas in 2006, where it has remained."

Millennium alleged that "[a]fter the execution of the TBA, Millennium believed that payment from Hanson would be forthcoming in short order, and it continued to rely on Wolfe for advice concerning the issue." In 2005, the IRS began an audit of certain post-Demerger tax returns of Hanson. Pursuant to that audit, and consistent with its 2002 determinations described above, the IRS issued a report that permitted Hanson to use the $65-million expenditures described above to exclude several specified insurance payments from income. At that time, Millennium again demanded payment. However, according to Millennium, "Hanson chose to again manufacture excuses for not paying, with Hanson (after consulting with Wolfe and Wolfe participating in crafting the message to Millennium) instead promising that payment would be made at the conclusion of any appeal." Millennium stated (1) in 2006, "Hanson and Wolfe" appealed the 2005 adjustments by the IRS described above (the "Appeal") and (2) "[t]hrough the substantial majority of the Appeal, Hanson was located in Texas, Wolfe frequently communicated with Hanson's employees, and Wolfe sent his invoices to Texas."

In November 2008, a settlement agreement was executed respecting the Appeal and Hanson subsequently notified Millennium of that settlement (the "IRS Settlement"). However, according to Millennium, (1) "Hanson, at Wolfe's direction, refused to provide Millennium with complete settlement documentation"; (2) Wolfe "directed" John Hutchinson, "Hanson's head of tax, located in Dallas," to "refuse all requests for a call, withhold additional documents and information, and provide deceptive answers concerning the IRS Settlement" in the hope that Millennium "would not suspect" that Hanson "had used the $65M Expenditures to obtain a tax

benefit" and thus had a payment obligation to Millennium; and (3) "[i]n the course of this cover-up, Wolfe repeatedly ghostwrote and approved misleading emails for Hutchinson (located in Texas) to send [Millennium]."

In 2009, the IRS commenced another audit of Hanson, this time focused on its 2002–2003 tax returns (the "2009 Audit"). According to Millennium, "Wolfe again represented Hanson during this audit, despite the clear conflict with Millennium, and continued to take positions that were adverse to Millennium's interests." Specifically, Millennium stated, (1) "Wolfe participated in a telephone conference with IRS officials in Dallas where he provided misleading factual information that blamed Millennium's prior tax director (Frank Lloyd) for wrongfully failing to include all four of the [insurance payments] into income on Millennium's 1995 tax return, rather than taking positions that would enable Millennium to be paid under the [Agreement and TBA]," and (2) after Hanson appealed the proposed adjustment resulting from the 2009 Audit, Wolfe attended a June 2010 meeting with "IRS Appeals" and Hanson in Dallas, where Wolfe "continued to advance these arguments concerning Millennium's prior alleged misconduct, failed to acknowledge or utilize the $65M Expenditures (which he knew Millennium wanted in order to secure the tax benefit payment), and failed to disclose relevant information and documents from the prior audits." Further, Millennium alleged that "[b]y continuing to represent Hanson and take these positions before the IRS, Wolfe directly violated fiduciary obligations that he owed to Millennium."

In approximately summer 2010, Millennium retained Jasper G. Taylor III, a tax lawyer at a Houston law firm, to "represent its interests in the 2009 Audit." Millennium stated (1) "Taylor reached out to Wolfe to gather information and documents and had several calls with Wolfe in the summer of 2010"; (2) during the course of those communications, "many of which Wolfe instigated," Wolfe "repeatedly made false representations and omitted material facts to Taylor

and other Millennium representatives (all located in Texas)," "refused to share material information and documents," and "steadfastly refused to take any steps that would assist Millennium—his longstanding client—in learning what had happened during the Hanson audits or gain the long owed tax benefit payment." Shortly thereafter, Fried Frank withdrew from its representation of Hanson in the 2009 audit. Following the resolution of that audit, Hanson "continued to refuse to pay Millennium" and "[a]s a consequence, Millennium filed this suit." Millennium asserted claims against appellants for breach of fiduciary duty, tortious interference with a contract, fraud, conspiracy, and legal malpractice.

In its claim for breach of fiduciary duty, Millennium stated in part, (1) "Fried Frank and Wolfe acted as legal counsel for Millennium in connection with the negotiation and execution of both the [Agreement] and TBA, and advised Millennium concerning its right to payment from Hanson after the IRS Adjustment"; (2) "[a]s a result, Fried Frank and Wolfe owed Millennium fiduciary duties"; and (3) "Wolfe and Fried Frank breached these fiduciary duties through extensive contacts with Texas, including Wolfe's June 2010 meeting with the IRS, Wolfe directing Hanson's Texas representatives to take steps that would harm and deceive Millennium, and through deceptive communications with Millennium's Texas representatives either directly or by ghostwriting or approving them for Hanson's Texas representatives to send." Additionally, Millennium stated in part that Fried Frank and Wolfe breached their fiduciary duties owed to Millennium when they "represented Hanson during the 2005 and 2009 audits" and "took positions in the 2005 and 2009 Audits that were adverse to Millennium's interests."

As to its claim for tortious interference with a contract, Millennium asserted "Fried Frank and Wolfe knew of the [Agreement] and TBA (indeed, Wolfe drafted them), and intentionally caused Hanson to breach its obligations under those agreements by, among other things: (1) advising Hanson to delay making required payments to Millennium; (2) orchestrating the IRS

Settlement; (3) directing a cover up concerning the details of the IRS Settlement to enable Hanson to delay making required payments to Millennium; (4) advising Hanson to withhold material documents and information from Millennium, in violation of the [Agreement]; and (5) making false representations and omissions to Millennium concerning the IRS Settlement and relevant Hanson audits."

In its fraud claim, Millennium contended in part "[d]efendants made false, material representations and/or omissions to Millennium," including falsely representing to Millennium "(1) the details of the 2005 Audit and IRS Settlement; (2) that the $65M Expenditures were not utilized as part of that settlement; (3) that IRS Appeals was responsible for reversing the exclusion of the 1998 and 2001 [insurance] Payments from income during the IRS Settlement; and (4) that Millennium had received all material documents and information relating to the IRS Settlement." Also, according to Millennium, "[d]efendants repeatedly failed to disclose material facts to Millennium," including "facts concerning the details of the 2005 Audit and IRS Settlement," "the fact that IRS Appeals had utilized the $65M Expenditures in reaching the IRS Settlement," and "material facts during a meeting with the IRS in Dallas in June 2010 during the 2009 Audit."

As to its conspiracy claim, Millennium alleged in part that defendants conspired with Hanson respecting the three claims described above and "took unlawful, overt acts during this conspiracy to harm Millennium including through false and deceptive communications with Millennium, representing Hanson during the 2005 and 2009 Audits, and directing Hanson's longstanding efforts to dodge and delay making required tax benefit payments to Millennium."

Finally, as to its legal malpractice claim, Millennium stated in part that Fried Frank and Wolfe "were, at all relevant times, in an attorney-client relationship with Millennium" and "committed legal malpractice by misrepresenting to Millennium the purpose of the TBA, and

omitting material facts, to induce Millennium to enter into that agreement in order to . . . lay the groundwork to subsequently deprive Millennium of its tax benefit recovery rights under the TSA" and benefit Hanson. Additionally, Millennium asserted Fried Frank and Wolfe "committed legal malpractice by representing Hanson in the IRS Settlement with the IRS which deprived Millennium of the tax benefit recovery to which it was entitled under the [Agreement] and TBA."

Defendants filed a verified special appearance with supporting evidence[3] and briefs. Plaintiffs filed a response and opposing brief [4] supported by evidence.[5] Additionally, defendants filed "Objections to Plaintiffs' Declarations and Exhibits." After a hearing, the trial court denied defendants' special appearance, ordered that defendants are subject to specific jurisdiction, and overruled defendants' objections to plaintiffs' declarations and exhibits. This interlocutory

---

[3] Defendants' evidence included, among other items, an affidavit of Wolfe, in which he stated in part (1) "I am a resident of New Jersey and have never been a resident of Texas"; (2) "I have not practiced law in Texas"; (3) "[n]o legal services that I or my colleagues at Fried Frank performed concerning the [TBA] were performed in Texas"; and (4) "[t]he [TBA] has no connection with Texas."

[4] In their brief in opposition to appellants' special appearance, plaintiffs stated in part that they were asserting only specific jurisdiction and "Millennium withdraws its contention that the [trial court] should also exercise its general jurisdiction over Defendants."

[5] The evidence filed by plaintiffs included, among other items, a letter to Hutchinson from the IRS containing meeting minutes of the June 2010 Dallas meeting described above that was attended by Wolfe. Those IRS meeting minutes described action taken on several issues as follows: (1) "Issue #1 (Insurance Proceeds (Accounting Method Change)) Appeals requested [taxpayer] to concede this issue"; (2) "Issue #2 (Insurance Proceeds (INA)) Appeals agreed to concede this issue"; and (3) "Issue #3 (Schedule M-1 Adjustments) Appeals agreed to concede this issue."

Additionally, the evidence filed by plaintiffs included an April 21, 2016 deposition of Wolfe in which Wolfe testified in part as follows:

> A. . . . At some point, the IRS began an audit of—
> Q. Hanson that included its 2003 tax year, right?
> A. Yes.
> . . . .
> Q. And one of the issues in this new audit was whether to tax the 2003 [insurance] payment, right?
> A. That was one of the issues, yes.
> . . . .
> Q. And the taxation of the 2003 [insurance] payment could potentially impact Millennium's right to a tax benefit payment from Hanson, right?
> A. Yes.
> . . . .
> Q. And did you take the position at that meeting that that payment should have been included in income in 1995 and thus was not taxable in 2003?
> A. That's my recollection that we took that position.
> Q. Did you bring up the 65 million in deferred deductions at that meeting?
> A. I don't recall us bringing up the 65 million of deferred deductions.
> . . . .
> Q. Did you tell them anything about the prior appeal settlement that had been reached in 2008?
> A. I don't remember.
> Q. Did you share with them the Marcos spreadsheet or any other documents that came out of that 2008 appeal?
> A. I don't remember.

appeal timely followed.  *See* TEX. CIV. PRAC. & REM. CODE ANN. § 51.014(a)(7) (West Supp. 2016).

## II. DENIAL OF SPECIAL APPEARANCE

### *A. Standard of Review*

Whether a court can exercise jurisdiction over a nonresident is a question of law.  *See, e.g.*, *Univ. of Ala. v. Suder Found.*, No. 05-16-00691-CV, 2017 WL 655948, at *2 (Tex. App.—Dallas Feb. 17, 2017, no pet.) (mem. op.) (citing *Kelly v. Gen. Interior Constr., Inc.*, 301 S.W.3d 653, 657 (Tex. 2010)).  Thus, we review de novo a trial court's order granting or denying a special appearance.  *Id*. (citing *Moki Mac River Expeditions v. Drugg*, 221 S.W.3d 569, 574 (Tex. 2007)).

However, the exercise of personal jurisdiction requires the trial court to resolve any factual disputes before applying the jurisdictional formula.  *Id*. at *3 (citing *Am. Type Culture Collection, Inc., v. Coleman*, 83 S.W.3d 801, 805–06 (Tex. 2002)).  When, as here, the trial court does not file findings of fact and conclusions of law in support of its special appearance ruling, we infer all facts necessary to support the judgment and supported by the evidence.  *Id*.; *accord O'Daire v. Rowand Recovery, LLC*, No. 05-16-01097-CV, 2017 WL 930036, at *2 (Tex. App.—Dallas Mar. 9, 2017, no pet.) (mem. op.); *see also Hotel Partners v. Craig*, 993 S.W.2d 116, 121 (Tex. App.—Dallas 1994, pet. denied) ("Absent findings of fact, we presume that any factual disputes were resolved in support of the trial court's order.").  When the appellate record includes the reporter's record and clerk's record, these implied findings are not conclusive and may be challenged for legal and factual sufficiency.  *See, e.g., Friend v. Acadia Holding Corp.*, No. 05-16-00286-CV, 2017 WL 1536503, at *3 (Tex. App.—Dallas Apr. 27, 2017, no pet.) (mem. op.) (citing *BMC Software Belgium, N.V. v. Marchand*, 83 S.W.3d 789, 795 (Tex. 2002)).  A legal sufficiency challenge to a finding of fact fails if there is more than scintilla of evidence to

support the finding. *Ahrens & DeAngeli, P.L.L.C. v. Flinn*, 318 S.W.3d 474, 479 (Tex. App.—Dallas 2010, pet. denied).

### B. Applicable Law

Texas courts may exercise personal jurisdiction over a nonresident defendant only if (1) the Texas long-arm statute permits the exercise of jurisdiction and (2) the jurisdiction satisfies constitutional due-process guarantees. *Suder Found.*, 2017 WL 655948, at \*3 (citing *Am. Type Culture*, 83 S.W.3d at 806). Our long-arm statute allows jurisdiction over a nonresident that does business in Texas. *Id*. (citing TEX. CIV. PRAC. & REM. CODE ANN. § 17.042 (West 2015)). That statute includes a list of acts that may constitute doing business in this state, including committing a tort in whole or in part in Texas. *Id*. (citing CIV. PRAC. & REM. CODE § 17.042(2)).

The "broad doing-business language allows the statute to reach as far as the federal constitutional requirements of due process will allow." *Id*. (quoting *Moki Mac*, 221 S.W.3d at 575). Constitutional due process permits a state to exercise jurisdiction only when a nonresident defendant has sufficient minimum, purposeful contact with the state, and the exercise of jurisdiction does not offend traditional notions of fair play and substantial justice. *Id*. (citing *Stull v. LaPlant*, 411 S.W.3d 129, 133 (Tex. App.—Dallas 2013, no pet.)).

We focus on two prongs when considering specific jurisdiction: (1) purposeful availment and (2) relatedness. *Suder Found.*, 2017 WL 655948, at \*3 (citing *Retamco Operating, Inc. v. Republic Drilling Co.*, 278 S.W.3d 333, 338 (Tex. 2009)). The purposeful availment prong analyzes (1) the defendant's own actions, but not the unilateral activity of another party; (2) whether the defendant's actions were purposeful rather than random, isolated, or fortuitous; and (3) whether the defendant sought some benefit, advantage, or profit by availing itself of the privilege of doing business in Texas. *Id*.; *see also Jani-King Franchising Inc. v. Falco Franchising, S.A.*, No. 05-15-00335-CV, 2016 WL 2609314, at \*3 (Tex. App.—Dallas May 5,

–10–

2016, no pet.) (mem. op.) (citing *Michiana Easy Livin' Country, Inc. v. Holten*, 168 S.W.3d 777, 785 (Tex. 2005)). It is "essential in each case that there be some act by which the defendant purposefully avails itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws." *Suder Found.*, 2017 WL 655948, at *3 (quoting *Hanson v. Denckla*, 357 U.S. 235, 253 (1958)). Further, the defendant's activities must justify a conclusion that the defendant could reasonably anticipate being called into a Texas court. *Id.* The "quality and nature of the defendant's contacts, rather than their number" governs the inquiry in the minimum contacts analysis. *Id.* (citing *Am. Type Culture*, 83 S.W.3d at 806).

The "relatedness" prong analyzes the relationship among the defendant, the forum, and the litigation. *Id.* at *4 (citing *Searcy v. Parex Res., Inc.*, 496 S.W.3d 58, 67 (Tex. 2016)). Courts may exercise specific jurisdiction when the defendant's forum contacts are "isolated or sporadic" only if the plaintiff's cause of action arises from or relates to those contacts. *Id.* (citing *TV Azteca v. Ruiz*, 490 S.W.3d 29, 37 (Tex. 2016); *Moncrief Oil Int'l Inc. v. OAO Gazprom*, 414 S.W.3d 142, 150 (Tex. 2013)). Thus, for a nonresident defendant's forum contacts to support an exercise of specific jurisdiction, there must be a "substantial connection between those contacts and the operative facts of the litigation." *Id.* (quoting *Cornerstone Healthcare Grp. v. Nautic Mgmt. VI, L.P.*, 493 S.W.3d 65, 73–74 (Tex. 2016)). "The operative facts are those on which the trial will focus to prove the liability of the defendant who is challenging jurisdiction." *Id.* (quoting *Leonard v. Salinas Concrete, LP*, 470 S.W.3d 178, 188 (Tex. App.—Dallas 2015, no pet.)).

"Telephone calls and correspondence as activities directed at the forum state" are "generally insufficient" to demonstrate purposeful availment. *Ahrens*, 318 S.W.3d at 484; *accord KC Smash 01, LLC v. Gerdes, Hendrichson, Ltd., L.L.P.*, 384 S.W.3d 389, 393–94 (Tex. App.—Dallas 2012, no pet.) (contacts "through telephone and email communications" do not

"constitute a contact demonstrating purposeful availment"); *see also O'Daire*, 2017 WL 930036, at \*3-4. Further, "[s]pecific jurisdiction is not established merely by allegations or evidence that a nonresident committed a tort in the forum state or 'directed a tort' at the forum state." *Ahrens*, 318 S.W.3d at 478; *accord Searcy*, 496 S.W.3d at 69. "Even if a nonresident defendant *knows* that the effects of its actions will be felt by a resident, that knowledge alone is insufficient to confer personal jurisdiction over the nonresident." *Searcy*, 496 S.W.3d at 69 (emphasis original).

Texas special appearance law dictates that the plaintiff and the defendant bear shifting burdens of proof in a personal jurisdiction challenge. *Kelly*, 301 S.W.3d at 658; *see also* TEX. R. CIV. P. 120a ("The court shall determine the special appearance on the basis of the pleadings, any stipulations made by and between the parties, such affidavits and attachments as may be filed by the parties, the results of discovery processes, and any oral testimony."). The plaintiff bears the initial burden to plead sufficient allegations to bring the nonresident defendant within the reach of Texas's long-arm statute. *Kelly*, 301 S.W.3d at 658. "Once the plaintiff has pleaded sufficient jurisdictional allegations, the defendant filing a special appearance bears the burden to negate all bases of personal jurisdiction alleged by the plaintiff." *Id*. "Because the plaintiff defines the scope and nature of the lawsuit, the defendant's corresponding burden to negate jurisdiction is tied to the allegations in the plaintiff's pleading." *Id*. "The defendant can negate jurisdiction on either a factual or legal basis." *Id*. "Factually, the defendant can present evidence that it has no contacts with Texas, effectively disproving the plaintiff's allegations." *Id*. "The plaintiff can then respond with its own evidence that affirms its allegations, and it risks dismissal of its lawsuit if it cannot present the trial court with evidence establishing personal jurisdiction." *Id*. "Legally, the defendant can show that even if the plaintiff's alleged facts are true, the evidence is legally insufficient to establish jurisdiction; the defendant's contacts with Texas fall

short of purposeful availment; for specific jurisdiction, that the claims do not arise from the contacts; or that traditional notions of fair play and substantial justice are offended by the exercise of jurisdiction." *Id.*

## *C. Application of Law to Facts*

As a preliminary matter, we note that appellants' argument in their appellate brief is organized by headings that do not directly correspond to each of their twelve stated issues. Rather, in the argument portion of their appellate brief, appellants primarily address what they describe as Millennium's "legal theories for specific jurisdiction" and, in doing so, address their appellate issues as those issues pertain to Millennium's purported theories. Millennium responds by providing a "consolidated and reframed" set of issues in its appellate brief, focused primarily on three "categories of contacts" it contends are "sufficient to justify jurisdiction." For purposes of clarity, we will, like the parties, base the organization of our analysis on Millennium's asserted bases for personal jurisdiction. Additionally, for purposes of our analysis, we will assume without deciding that the evidence offered by Millennium and objected to by appellants in the trial court is properly before this Court on appeal.

Millennium contends on appeal that "[i]n the course of his multi-year scheme to enhance his standing with Hanson by depriving Millennium of a tax benefit payment, Wolfe: (1) came to Texas and breached duties owed to Millennium while present in the state; (2) repeatedly induced Hanson's Texas representatives to engage in tortious acts within Texas that breached Wolfe's duties; and (3) continuously communicated with Texas residents to orchestrate each tortious step and garner ongoing benefits from the state." Further, Millennium states that "[u]nder Texas law, each of those categories of contacts is sufficient to justify jurisdiction because each shows that (1) the defendant has purposefully availed himself of the privilege of conducting activities in the

–13–

forum state, and (2) there is a substantial connection between those contacts and the operative facts of the litigation." We address those three categories of contacts in turn.

First, Millennium asserts it "has alleged and shown through evidence that, while physically present in Texas, Wolfe breached fiduciary duties owed to Millennium" and therefore Wolfe is "subject to jurisdiction here" pursuant to section 17.042(2). *See* CIV. PRAC. & REM. CODE § 17.042(2) (nonresident does business in this state if he "commits a tort in whole or in part in this state"). According to Millennium, (1) "Wolfe admits that he knew his [June 2010] Texas meeting would *directly impact* Millennium's right to obtain a tax benefit payment from Hanson" (emphasis original); (2) "[n]onetheless, Wolfe came to Texas and took positions adverse to Millennium"; and (3) "[d]efendants have provided no evidence to negate those contacts with Texas." In support of its position, Millennium cites the IRS meeting minutes and excerpts from Wolfe's deposition testimony described above and argues as follows:

> Thus, Wolfe has acknowledged that, while in Texas: (1) he discussed the 2003 [insurance] Payment, cognizant that how it was taxed would impact Millennium; and (2) he took positions adverse to Millennium—specifically, not discussing or advocating for use of the deferred $65M Expenditures, and not disclosing the Settlement and related documentation, which deprived Millennium of obtaining a tax benefit payment from Hanson. Furthermore, the IRS's meeting minutes reflect that other key disputes were fully resolved at this meeting, highlighting the importance of Wolfe's conduct with respect to the issues impacting Millennium.
> Wolfe could have chosen not to visit Texas or do anything in Texas to harm Millennium. Instead, while in Texas, he decided, among other objectionable things, not to disclose critical information that would have gotten Millennium the tax benefit payment he had counseled Millennium it would receive under the [Agreement]/TBA. Millennium has thus clearly alleged and shown through evidence that Wolfe's conduct in Texas is connected to Millennium's claims.

(citations to record omitted). Additionally, Millennium asserts defendants cannot "avoid jurisdiction" by (1) "challenging whether a tort occurred in a Texas meeting" or (2) "denying wrongdoing and offering a competing account of a meeting." In support of that assertion, Millennium cites *Lensing v. Card*, 417 S.W.3d 152, 157 (Tex. App.—Dallas 2013, no pet.). Further, Millennium (1) argues that in *Moncrief*, the supreme court "found that engaging in

–14–

misconduct during two Texas meetings constituted sufficient purposeful availment to justify specific jurisdiction, even though the nonresident disclaimed any wrongdoing at the meetings," and (2) contends *Searcy* "supports the trial court's ruling."

Appellants argue in part that the record does not show the contact in question, i.e. Wolfe's attendance at the June 2010 meeting, has "a substantial connection to the operative facts of the dispute that will be the 'focus of the trial.'" Specifically, according to appellants, (1) "[p]laintiffs claim that their ***allegations alone*** establish personal jurisdiction over Wolfe" (emphasis original); (2) however, "once a defendant shows that the facts plaintiffs allege are legally insufficient—as here—the burden shifts back to the plaintiffs to produce evidence that the facts supporting their claim occurred in Texas" ; and (3) the portion of Wolfe's testimony cited by plaintiffs "merely indicates that Wolfe does not recall 'bringing up the 65 million of deferred deductions' or discussing the prior appeal settlement."

Further, in their reply brief on appeal, appellants contend in part,

> Plaintiffs . . . allege that at the single meeting in Texas, Wolfe "failed to acknowledge or utilize the $65M Expenditures," and "failed to disclose relevant information and documents from the prior audits . . . ." The only evidence that Plaintiffs cite to support their argument is Wolfe's deposition testimony. But Wolfe testified that he doesn't remember whether the $65 million deductions were discussed at the meeting.
> Plaintiffs' argument seems to be that the $65 million deduction was not discussed at the 2010 meeting, but they: (1) cite no evidence to establish this, and (2) fail to explain how the alleged failure to discuss the $65 million deduction at one kick-off meeting in 2010 damaged them. Plaintiffs claim that merely alleging such facts is enough, but allegations unsupported by evidence are insufficient as a matter of law.

(citations to record omitted). Also, appellants assert that although plaintiffs "try to bolster the significance of this [June 2010] meeting" by arguing that "other key disputes were fully resolved at this meeting," the alleged resolution of other disputes does not support specific jurisdiction over this case. Appellants contend that because they "negated jurisdiction," Millennium could

avoid dismissal only by "respond[ing] with its own evidence that affirms its allegations," which, according to appellants, Millennium "utterly failed to do."

As described above, (1) we focus on two prongs when considering specific jurisdiction: "purposeful availment" and "relatedness," and (2) the "relatedness" prong requires a "substantial connection" between a nonresident's forum contacts and "the operative facts of the litigation." *Suder Found.*, 2017 WL 655948, at *3–4. The record shows Millennium pleaded sufficient allegations to bring appellants within the reach of Texas's long-arm statute, including in part that Fried Frank and Wolfe breached their fiduciary duties owed to Millennium when they "represented Hanson" during the appeal of the 2009 audit and "continued to take positions" during the June 2010 Dallas meeting that were "adverse to Millennium's interests" respecting the disputed tax benefits addressed in the TBA. However, in connection with their special appearance, appellants filed evidence that included, among other items, an affidavit of Wolfe in which he testified in part (1) "I have not practiced law in Texas"; (2) "[n]o legal services that I or my colleagues at Fried Frank performed concerning the [TBA] were performed in Texas"; and (3) "[t]he [TBA] has no connection with Texas." That evidence, on its face, negated plaintiffs' allegations as to the June 2010 Dallas meeting. *See Kelly*, 301 S.W.3d at 658. At that point, Millennium "risk[ed] dismissal of its lawsuit" unless it met its burden to "present the trial court with evidence establishing personal jurisdiction." *See id*.

Millennium contends the evidence cited in its argument described above shows Wolfe's attendance at the June 2010 meeting is substantially connected to "Millennium's claims." However, in the deposition testimony of Wolfe cited by Millennium, Wolfe states he does not recall "bringing up the 65 million of deferred deductions" and does not remember whether he told the IRS about the settlement in 2008 or shared any related documents with the IRS. Thus, that testimony does not constitute evidence of what Wolfe did or did not do at the meeting.

Additionally, the fact that the IRS meeting minutes show some issues were resolved at the June 2010 meeting is not evidence that Wolfe withheld information or did not assert a position that would benefit Millennium.

Further, to the extent Millennium relies on *Lensing* to support its position respecting its burden of proof, that case is distinguishable. *Lensing* involved a dispute over the ownership of a grave marker alleged to be a historical artifact. *See* 417 S.W.3d at 154. Heritage Auctions, Inc., a Texas corporation, facilitated contact between Texas resident Holly Ragan and Illinois resident Wayne Lensing that resulted in the sale of the grave marker by Ragan to Lensing. *Id*. Lensing traveled to Texas to complete the transaction and take possession of the grave marker. *Id*. Subsequently, appellees contacted Lensing and demanded the grave marker, asserting it had belonged to their now-deceased parents and was never owned by Ragan. *Id*. Lensing refused, claiming the grave marker was his. *Id*. Appellees then sued Lensing for declaratory judgment, conversion, violation of the Texas Theft Liability Act, and civil conspiracy. *Id*. Lensing filed a special appearance, which was denied by the trial court. *Id*. at 154–55.

On appeal, appellees asserted specific jurisdiction existed because (1) Lensing negotiated and contracted with a Texas resident to buy the grave marker as the result of actions by a Texas-based company; (2) Lensing performed the contract in whole or in part in Texas when he traveled to Texas to pay for and take possession of the grave marker; and (3) appellees' claims arose directly from those contacts with Texas. *Id*. at 156. The evidence included affidavits by Lensing and Ragan and testimony by appellee David Card, and there was "little if any disagreement between the facts supported by Lensing's evidence and appellees' specific-jurisdiction allegations." *Id*. at 157. This Court observed that Lensing (1) "contends that minimum contacts are lacking because he did not commit the tort of conversion until he refused appellees' demand for the tombstone, which occurred when he was in Illinois," and (2) "focuses

–17–

on his alleged lack of culpability and the allegedly nontortious quality of his actions in Texas." *Id*. at 159–60. This Court reasoned "Lensing's focus is misplaced" because the Texas Supreme Court (1) has "disapprove[d] all Texas opinions holding that "specific jurisdiction turns on whether a defendant's contacts were tortious rather than the contacts themselves," *id*. at 160 (citing *Michiana*, 168 S.W.3d at 791–92), and (2) "recently reiterated that 'what the parties thought, said, or intended is generally irrelevant to their jurisdictional contacts,'" *id*. (citing *Moncrief*, 414 S.W.3d at 147). Thus, this Court stated (1) "in this case we do not consider whether Lensing's Texas activities amounted to a tort or not; we consider only whether they rise to the level of minimum contacts" and (2) "Lensing's evidence that he subjectively believed he was buying the grave marker from its rightful owner is irrelevant." *Id*. at 160. This Court concluded "Lensing's Texas contacts—specifically his flying to Texas and his purchasing and taking possession of the grave marker in Texas before transporting it back to Illinois—amounted to purposeful availment." *Id*. at 158.

Then, this Court stated, "The other half of the minimum-contacts analysis for specific jurisdiction is whether there is a substantial connection between the defendant's forum contacts and the operative facts of the litigation." *Id*. at 161. This Court reasoned (1) "Lensing does not appear to be challenging the substantial-connection part of the minimum-contacts test in this appeal" and (2) "[r]ightful ownership of the grave marker is at the heart of this case, and facts bearing on that ownership will be operative facts in the litigation." *Id*. Therefore, this Court concluded, "the acts Lensing committed while in Texas ostensibly giving him title to the grave marker have a substantial connection to the operative facts of the case." *Id*.

Unlike the case before us, *Lensing* did not involve a challenge to the substantial-connection prong of the minimum-contacts test or a dispute as to the statements and actions of the parties in Texas. *See id*. Likewise, in *Moncrief*, (1) the evidence was uncontroverted that the

defendants attended two Texas meetings at which they accepted the plaintiff's alleged trade secrets regarding a proposed joint venture in Texas, (2) there was no dispute respecting the statements made while the defendants were in Texas, and (3) the supreme court's analysis involved only whether the contacts in question were "purposeful" and did not specifically address the substantial-connection prong. *See Moncrief*, 414 S.W.3d at 151–54. Additionally, in *Searcy*, (1) the defendant did not dispute the allegedly fraudulent representations made during meetings in Texas, but rather argued that the individual making those representations had no authority to represent defendant, and (2) the supreme court described evidence in the record that supported the trial court's finding of actual and apparent authority of the individual who made the representations. *See Searcy*, 496 S.W.3d at 77. Therefore, we do not find *Lensing*, *Moncrief*, or *Searcy* instructive.[6]

On this record, we conclude there is no evidence of a substantial connection between Wolfe's attendance at the June 2010 Dallas meeting and the operative facts of the litigation, i.e., whether appellants breached their fiduciary duties owed to Millennium when they "represented Hanson" during the appeal of the 2009 audit and "continued to take positions" during the June 2010 Dallas meeting that were "adverse to Millennium's interests" respecting the disputed tax benefits addressed in the TBA. Therefore, Wolfe's attendance at that meeting does not constitute a contact supporting specific jurisdiction. *See Searcy*, 496 S.W.3d at 70 ("Specific

---

[6] Additionally, in its argument in the trial court respecting its burden, Millennium cited *Max Protetch, Inc. v. Herrin*, 340 S.W.3d 878 (Tex. App.—Houston [14th Dist.] 2011, no pet.), which it cites generally in its appellate brief. In that case, a Texas plaintiff ordered a custom-made table from a nonresident defendant, Max Protetch. *Id*. at 882. The parties did not dispute that after the table arrived in Texas, the defendant met with the plaintiff in Houston and discussed alleged defects respecting the table. *Id.* Subsequently, the plaintiff asserted theft and fraud claims based on alleged misrepresentations of the defendant at that meeting that purportedly induced the plaintiff to return the table to New York at his own expense. *Id*. at 882–83. The defendant filed a special appearance, which was denied by the trial court. *Id*. at 883. The court of appeals affirmed, stating in part, (1) "[a]ssuming (as would support the judgment) that Mr. Protetch initiated the Houston contact, we hold that this meeting and the representations allegedly made there were purposeful contacts" and (2) "[a]t that meeting, a purposeful contact on Texas soil, Mr. Protetch made representations that form a substantial portion of the core of the litigation." *Id*. at 887–88. Unlike the case before us, *Max Protetch, Inc*. did not involve any dispute as to whether the meeting in question had a substantial connection to the operative facts of the litigation. *See id*. at 888.

jurisdiction . . . does not exist where the defendant's contacts with the forum state are not substantially connected to the alleged operative facts of the case"); *Kelly*, 301 S.W.3d at 658.

Second, Millennium contends specific jurisdiction exists because Wolfe "repeatedly induced Hanson's Texas representatives to engage in tortious acts within Texas that breached Wolfe's duties." According to Millennium, (1) "[i]n response to each Millennium question concerning the Settlement in early 2009, Wolfe instructed Hutchinson (in Texas) to respond with deception—ghost writing carefully crafted, yet misleading emails for Millennium; to withhold critical information that would expose Hanson's payment obligation; and to rebuff Millennium's requests to talk with Wolfe"; (2) "Hutchinson consistently refused to act without Wolfe's direction, and Wolfe consistently decided to deceive Millennium by having Hanson act in Texas"; (3) "Wolfe's contact with Hutchinson was so pervasive that he effectively was 'in the room' in Dallas as he dictated the strategy relating to Millennium"; and (4) "[t]his virtual presence subjects [d]efendants to the jurisdiction of [the trial court]." In support of its "virtual presence" argument, Millennium cites (1) testimony of Hutchinson from the arbitration proceeding between Millennium and Hanson described above in which Hutchison states in part that he declined to "have a call" with Siegel respecting the IRS Settlement "[b]ecause [Wolfe] advised me not to"; (2) several email communications between Hutchinson and Wolfe[7]; and (3) two Texas cases, *Schexnayder v. Daniels*, 187 S.W.3d 238 (Tex. App.—Texarkana 2006, pet.

---

[7] In its brief on appeal, Millennium describes those emails in bullet points as follows:

• On April 20, 2009, Hutchinson crafted a response to an email from Siegel asking Hutchinson to identify the years Hanson obtained the tax benefit as a result of the Settlement that falsely reported that "the $65 million adjustment . . . did not roll into any of Hanson's tax years." Hutchinson asked Wolfe to approve the response, and sent the message only after Wolfe provided the green light.

• On April 22, 2009, Siegel asked Hutchinson why IRS Appeals reversed course and did not use the $65M Expenditures. Hutchinson forwarded the email to Wolfe and commented, "Looks like we are entering the next phase. Please call and/or propose the next response." Wolfe responded, "I will call you shortly," and his notes reflect a call with Hutchinson that day.

• In May 2009, when Siegel again asked for additional Settlement documents to which Millennium was contractually entitled and a call with Wolfe (his longtime lawyer on the relevant contracts), Siegel's supervisors at Lyondell (who resided in Texas), and Hutchinson (who also resided in Texas), Wolfe wrote Hutchinson a truly astounding email: "I'm not sure how I feel about sending [Siegel] the [information regarding the Settlement] . . . This could get nasty, and I think it's best that we send [Siegel] nothing further, at least until someone who understands litigation tells us otherwise."

–20–

dism'd w.o.j.), and *Luxury Travel Source v. American Airlines, Inc.*, 276 S.W.3d 154 (Tex. App.—Fort Worth 2008, no pet.). Additionally, Millennium asserts that although Texas case law "limit[s] jurisdiction in direct-a-tort situations," this case is distinguishable because, in addition to inducing Texas residents to execute his torts within the state, "Wolfe came to Texas," and "Millennium's claims flow from [d]efendants' multiple, purposeful acts in and through Texas."

Appellants argue (1) Millennium's "so-called 'virtual presence'" theory is merely a different label for the "direct-a-tort" theory that has been "repudiated" by the Texas Supreme Court and (2) "[p]laintiffs cite no support for their novel theory that [d]efendants are subject to jurisdiction for torts they allegedly directed Hanson to commit in Texas, other than *Schexnayder* and *Luxury Travel*," which cases "are not like this one."

In *Schexnayder*, a Texas plaintiff alleged that medical treatment her two-year-old daughter received at the direction of Stephen M. Schexnayder, an Arkansas physician, led to her daughter's death. *See* 187 S.W.3d at 242. In response to the plaintiff's medical malpractice action against him, Schexnayder sought a special appearance, which was denied by the trial court. *Id*. On appeal, Schexnayder contended "the evidence concerning his connection to the medical care and treatment of the patient (with which Schexnayder does not disagree or controvert), does not meet the legal standard for imposing the jurisdiction of Texas courts." *Id*. The court of appeals affirmed. That court stated the evidence was "largely uncontroverted" and showed (1) the child was hospitalized in Texas in serious condition; (2) the Texas hospital called a nearby hospital in Arkansas and arranged for the child to be transported to the Arkansas hospital, where Schexnayder was the intensive care unit's attending physician; (3) a "transport team" from the Arkansas hospital, which included resident physician Barrett Lewis, was sent to Texas; (4) Schexnayder, who remained in Arkansas, "was contacted in three telephone conversations, all originating in Texas and totaling about an hour in length, from individuals

caring for [the child]"; (5) "Schexnayder, as an active participant with the team, took over as [the child's] attending physician and became directly engaged in her care"; (6) Schexnayder "gave Lewis detailed instructions on treating and medicating [the child], . . . all of which directions were promptly followed by Lewis," and "ultimately made the decision that further efforts to save the child would be futile"; and (7) "[i]t is apparent that, in this emergency situation, Lewis was not merely asking Schexnayder for advice and then determining whether to follow it, but that Schexnayder was directing the team in its care of [the child]." *Id*. at 244. The court of appeals stated (1) "[t]he facts of the instant case reflect much more than a mere contact, or more than a request for advice or consultation" and (2) Schexnayder "was not a mere bystander, but was effectively there with the team in all but body." *Id*. Further, that court stated, "We emphasize, however, that this ruling is limited to these facts, and should not automatically be expanded to dissimilar situations." *Id*. at 247.

In *Luxury Travel*, an airline, American, alleged that a nonresident travel agency, LTS, improperly bought and sold frequent flyer miles awarded by the airline to its customers. *See* 276 S.W.3d at 159. American asserted claims against LTS for tortious interference with contracts and business relations, fraud, misappropriation, breach of contract, and violation of the state trademark laws. *Id*. LTS filed a special appearance, which was denied by the trial court. *Id*. The court of appeals affirmed. *Id*. The court of appeals observed that the evidence showed LTS (1) obtained Texas customers via several websites; (2) directly contacted at least two Texas residents by email and, for the purposes of obtaining the benefit of those customers' airline rewards points, induced them to contact American to issue tickets with those rewards points for existing reservations that LTS had already made for the benefit of other customers; and (3) then sent checks to at least one of those customers in Texas. *Id*. at 164. That court stated (1) "[t]hus, there is some evidence that LTS used its contacts with Texas residents to deliberately induce

activity in Texas by American, and LTS's customers, to LTS's benefit"; (2) "[a]dditionally, part of LTS's agreements with its Texas customers, at least as to sales of reward points, were performable in Texas"; and (3) "[t]hese contacts between LTS and Texas are substantially connected to the operative facts underlying the causes of action alleged by American: its means of contacting Texas residents and the activities that it induced in Texas are the crux of American's complaint." *Id*. at 164. Additionally, the court of appeals stated (1) "LTS's contacts went further than merely taking an order from a customer" and (2) "LTS deliberately induced its Texas customers to undertake further activity in Texas, directed at a Texas business, in direct contravention of an agreement between those residents and the Texas business." *Id*. at 164.

In the case before us, Millennium contends in part,

The facts of this case, *Schexnayder*, and *Luxury Travel* are strikingly similar. Just as in *Schexnayder*, Wolfe provided a Texas actor (Hutchinson) with detailed instructions, and because Hutchinson would not communicate with Millennium without instructions and approval from, and in many case emails ghostwritten by, Wolfe, Wolfe effectively made the decisions about what information was shared (or not) with Millennium from Texas. Just as in *Luxury Travel*, Wolfe "induced" Hutchinson to "undertake further activity in Texas" (sending false communications to Millennium), that was "directed at a Texas business" (Millennium), "in direct contravention of an agreement" between Millennium and Hanson (the TSA), and in violation of Defendants' independent fiduciary duties owed to Millennium.

Additionally, Millennium asserts (1) like the defendant in *Schexnayder*, "Wolfe was 'effectively [in Texas] with the team in all but body'"; (2) "Millennium has presented detailed evidence demonstrating Wolfe's systematic control over Hanson's Texas representatives in the scheme to defraud Millennium"; and (3) Hutchinson's arbitration testimony described above "affirmed Wolfe's complete control over these Texas acts."

As described above, the record shows Hutchinson testified during the arbitration proceeding that he declined to "have a call" with Siegel respecting the IRS Settlement "[b]ecause [Wolfe] advised me not to." Further, the emails cited by Millennium showed instances in which

Hutchinson requested Wolfe to "approve" and "propose" courses of action and in which Wolfe stated to Hutchinson what course of action he thought would be "best." None of that evidence shows that Hutchison "refused to act without Wolfe's direction" or that Wolfe exercised "complete control" over Hutchinson's actions. Therefore, we do not find *Schexnayder* persuasive. *See Schexnayder*, 187 S.W.3d at 244 ("[t]he facts of the instant case reflect much more than a mere contact, or more than a request for advice or consultation").

Nor do we agree with Millennium's position that *Luxury Travel* supports personal jurisdiction in this case. Unlike *Luxury Travel*, the case before us does not involve a defendant that contacted Texas residents who responded to its website advertisements, induced those Texas residents to "undertake further activity" that was allegedly fraudulent, then sent checks to at least one of those Texas residents. *See Luxury Travel*, 276 S.W.3d at 164. Therefore, that case is distinguishable.

On this record, we disagree with Millennium's position that the purported "inducing" described by it above gave rise to specific jurisdiction over appellants. *See Searcy*, 496 S.W.3d at 69 (stating supreme court has "expressly rejected the 'directed-a-tort' theory from the jurisprudence surrounding specific jurisdiction"); *Ahrens*, 318 S.W.3d at 478 ("Specific jurisdiction is not established merely by allegations or evidence that a nonresident committed a tort in the forum state or 'directed a tort' at the forum state."). Additionally, Millennium contends this case is distinguishable from the "direct-a-tort" cases relied upon by appellants because "Wolfe came to Texas," and "Millennium's claims flow from [d]efendants' multiple, purposeful acts in and through Texas." However, we concluded above that Wolfe's sole physical visit to Texas, i.e., his attendance at the June 2010 meeting, does not support specific jurisdiction. To the extent Millennium argues it can satisfy the requirements for specific

jurisdiction by combining that insufficient contact with the purported "inducing" described above, it cites no authority for that position and we have found none.

Third, Millennium contends personal jurisdiction exists based on "[d]efendants' continuous communications with Texas to seek ongoing benefits from the state." According to Millennium, (1) "Wolfe engaged in numerous communications with both Hanson's and Millennium's Texas representatives while executing his scheme and sought to profit, both personally and for his firm, from these dealings," and (2) "[w]hen viewed together with Wolfe's physical and virtual presence in Texas, the nature, number and scope of these communications establish sufficient minimum contacts with Texas for the trial court to exercise specific jurisdiction over [d]efendants." In support of that argument, Millennium cites (1) evidence showing numerous calls and emails to and from Wolfe while he was outside of Texas and (2) several Texas cases. *See Searcy*, 496 S.W.3d at 58; *Cornerstone*, 493 S.W.3d at 65; *Gray, Ritter & Graham, PC v. Goldman Phipps PLLC*, 511 S.W.3d 639 (Tex. App.—Corpus Christi 2015, pet. denied); *Glencoe Capital Partners II, LP v. Gernsbacher*, 269 S.W.3d 157 (Tex. App.—Fort Worth 2008, no pet.); *Wilson v. Baker*, No. 03-10-00507-CV, 2011 WL 6938523 (Tex. App.—Austin Dec. 29, 2011, no pet.) (mem. op.). Additionally, Millennium distinguishes *KC Smash* as follows: (1) "[i]n KC Smash, the defendant 'never physically entered this state,' the case centered on breach of contract as opposed to tort claims, and the defendant 'did not seek some benefit, advantage, or profit' from contacts with Texas" and (2) "[i]n contrast, Wolfe did come to Texas, tort claims are involved, and Wolfe and Fried Frank were pursuing benefits from their Texas contacts."

Appellants argue in part (1) "Texas case law establishes that communications—including communications by attorneys—made through phone calls and emails are insufficient to establish personal jurisdiction" and (2) Millennium does not address the distinction between "***seeking***

*clients* in Texas" and "***continuing to represent*** a client who unilaterally moved to Texas" (emphasis original).

Unlike the case before us, none of the cases cited by Millennium in support of its "continuous communications" argument involved communications from outside of Texas by an attorney continuing to represent a client who moved to Texas after the attorney–client relationship was established. Further, three of those cases involved defendants who sought business from Texas residents. *See Cornerstone*, 493 S.W.3d at 73; *Glencoe Capital Partners*, 269 S.W.3d at 165; *Wilson*, 2011 WL 6938523, at *5. Based on that factual distinction, we do not find those cases persuasive. The remaining two cases involved defendants who made physical visits to Texas. *See Searcy*, 496 S.W.3d at 77; *Gray, Ritter & Graham*, 511 S.W.3d at 663. Additionally, as described above, Millennium includes Wolfe's physical visit to Texas in its argument distinguishing *KC Smash.* In light of our conclusions above, Wolfe's physical presence in Texas is not relevant to this analysis.

On this record, we conclude the "continuous communications" alleged by Millennium did not establish sufficient minimum contacts with Texas for the trial court to exercise specific jurisdiction over appellants. *See KC Smash*, 384 S.W.3d at 393–94; *Ahrens*, 318 S.W.3d at 484; *O'Daire*, 2017 WL 930036, at *3–4; *see also Searcy*, 496 S.W.3d at 62, 74 (concluding that while specific jurisdiction existed over defendant who had made representations at Texas meeting substantially connected to operative facts, record did not support specific jurisdiction over other remaining defendants, despite numerous phone calls and emails between them and Texas residents). Further, to the extent Millennium argues that the communications in question, "together with Wolfe's physical and virtual presence in Texas," establish sufficient minimum contacts with Texas to support specific jurisdiction over defendants, we concluded above that the "physical and virtual presence" of Wolfe alleged by Millennium does not support specific

jurisdiction. Millennium cites no authority, and we have found none, to support the position that combining those insufficient contacts with the communications described above would result in satisfying the requirements for personal jurisdiction.

We decide in favor of appellants on their first and twelfth issues.

### III. CONCLUSION

We decide appellants' first and twelfth issues in their favor. We need not address appellants' remaining issues.[8]

We reverse the trial court's order denying appellants' special appearance and render judgment dismissing Millennium's claims against appellants for lack of personal jurisdiction.

161132F.P05

/Douglas S. Lang/
DOUGLAS S. LANG
JUSTICE

---

[8] As described above, appellants assert in their seventh issue "[d]efendants are immune from suit and personal jurisdiction under the longstanding doctrine of attorney immunity, since [p]laintiffs' complaints all are about [d]efendant-attorneys' representation of their client." According to appellants, "case law is clear that immunities from suit can be raised in special appearances contesting personal jurisdiction, and attorney immunity is immunity from suit."

Generally, attorneys are immune from civil liability to non-clients for actions taken as "part of the discharge of the lawyer's duties in representing his or her client." *Cantey Hanger, LLP v. Byrd*, 467 S.W.3d 477, 481 (Tex. 2015). However, the parties cite no authority, and we have found none, requiring this Court to address the issue of attorney immunity prior to addressing specific jurisdiction in an appeal from the denial of a special appearance. *See id.* ("[a]ttorney immunity is an affirmative defense"); *see also* TEX. R. CIV. P. 120a (challenge to personal jurisdiction "shall be heard and determined before . . . any other plea or pleading may be heard").

–27–



# Court of Appeals
# Fifth District of Texas at Dallas

## JUDGMENT

FRIED, FRANK, HARRIS, SHRIVER & JACOBSON LLP AND RICHARD A. WOLFE, Appellants

No. 05-16-01132-CV     V.

MILLENNIUM CHEMICALS INC., MILLENNIUM AMERICA HOLDINGS, LLC AND MILLENNIUM HOLDINGS, LLC, Appellees

On Appeal from the 116th Judicial District Court, Dallas County, Texas
Trial Court Cause No. DC-12-13422.
Opinion delivered by Justice Lang, Justices Myers and Stoddart participating.

In accordance with this Court's opinion of this date, we **REVERSE** the trial court's order denying the special appearance of appellants Fried, Frank, Harris, Shriver & Jacobson LLP and Richard A. Wolfe, and **RENDER** judgment dismissing the claims of appellees Millennium Chemicals Inc.; Millennium America Holdings, LLC; and Millennium Holdings, LLC against appellants Fried, Frank, Harris, Shriver & Jacobson LLP and Richard A. Wolfe for lack of personal jurisdiction.

It is **ORDERED** that appellants Fried, Frank, Harris, Shriver & Jacobson LLP and Richard A. Wolfe recover their costs of this appeal from appellees Millennium Chemicals Inc.; Millennium America Holdings, LLC; and Millennium Holdings, LLC.

Judgment entered this 31st day of July, 2017.